1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF VIRGINIA
2          ALEXANDRIA DIVISION

3   --------------------------x
    UNITED STATES OF AMERICA,  :    Criminal Action No.:
4                              :    1:16-cr-42
         versus                :
5                              :
    ARDIT FERIZI,              :    Thursday, March 31, 2022
6                              :
              Defendant.       :
7   --------------------------x

8        The above-entitled hearing was heard before the
    Honorable Leonie M. Brinkema, United States District Judge.
9   This proceeding commenced at 10:04 a.m.

10              A P P E A R A N C E S:

11  FOR THE GOVERNMENT:    DANYA ATIYEH, ESQUIRE
                           JOSEPH ATTIAS, ESQUIRE
12                         MICHAEL GILL, ESQUIRE
                           OFFICE OF THE UNITED STATES ATTORNEY
13                         2100 Jamieson Avenue
                           Alexandria, Virginia  22314
14                         (703) 299-3700

15

16  FOR THE DEFENDANT:     ELIZABETH MULLIN, ESQUIRE
                           CAROLINE PLATT, ESQUIRE
17                         OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           1650 King Street
                           Suite 500
18                         Alexandria, Virginia  22314
                           (703) 600-0800

19

20      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

21

22

23

24

25

                                                            1

```
 1                    P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Criminal Case 16-42, United

 3   States of America versus Ardit Ferizi.

 4           Would counsel please note their appearances for

 5   the record.

 6           MS. ATIYEH:  Good morning, Your Honor.

 7   Danya Atiyeh, Joseph Attias and Mike Gill on behalf of the

 8   United States.

 9           THE COURT:  Good morning.

10           MS. MULLIN:  Good morning, Your Honor.  Elizabeth

11   Mullin and Caroline Platt on behalf of Ardit Ferizi.

12           THE COURT:  All right.  And I should tell you that

13   we have two members of Judge Alsup's staff who are listening

14   in on this proceeding via telephone because they're out on

15   the west coast, and I want counsel to be aware of that.  All

16   right.

17           Well, we set this hearing today because I was

18   expecting to get some information from the Government as to

19   what happened in the California case, and I've not received

20   anything yet.

21           So, Ms. Atiyeh, do you want to tell me what's

22   going on?

23           MS. ATIYEH:  I will do my best, Your Honor.  And

24   I -- I want to thank Your Honor for calling this hearing

25   today, because it has put us in a position where we have
```

1    been able to speak with the Northern District of California

2    and get answers that were perhaps more satisfying to our

3    office than what we had before.

4         And, Your Honor, in your order, your initial

5    question was asking the Government to provide a clear

6    explanation as to how the decision was made to bring the

7    California charges and why.  And on that point, Your Honor,

8    I -- I'm not sure that I have a fulsome answer for you.

9         We -- when those charges were filed, Your Honor,

10   our office filed a notice in this court, and what we said in

11   that notice was true then, and it's true today.  We were not

12   consulted, we had no information that these charges were

13   going to be filed until after they already had been.  We did

14   not -- there was no back-and-forth.  We had not communicated

15   with them at all.  These charges came as much of a surprise

16   to us as they did to the Court and to counsel.

17        The AUSA in the Northern District of California

18   who brought those charges was at the time the chief of their

19   fraud unit in the San Francisco office.  And since that time

20   in -- at the end of this past year, so at the end of

21   December of 2021, he left that office, left the Government,

22   and went to private practice, and we haven't been able to

23   get in touch with him to get his insights on what evidence

24   he believed there was or what communications he might have

25   had with FBI or anything.  That, to us, is a black box at

                                                              3

1    this point, Your Honor, and I don't know that we have a way

2    to get that information.

3            THE COURT:  Well, has he completely gone off the

4    radar?  I mean, lawyers are lawyers.  I assume he went to a

5    private firm?

6            MS. ATIYEH:  That's my understanding, Your Honor,

7    but they haven't been in touch with him at all.

8            THE COURT:  All right.

9            MS. ATIYEH:  At that point -- so at the beginning

10   of January of this year, a new case team at NDCA came onto

11   the case.  And that -- that case team consisted of two

12   AUSAs, and also a team I think of two attorneys from CCIPS,

13   the Computer Crimes and Intellectual Property Section at

14   Main Justice and, at that point, they began to assess the

15   evidence in the case.

16           And, Your Honor, I don't know the answer to what

17   the discrepancy was, but when they looked at that evidence,

18   they believed that they did not have sufficient evidence on

19   the mens rea prong of four of the five charges.

20           And this was something that developed between

21   January, when I first got a call from them asking about

22   discovery, because it appears that there had been a

23   substantial amount of discovery from the prior case in EDVA

24   that had never been reviewed by the NDCA office.

25           So I got a call from the new AUSAs asking me to

                                                              4

```
1   provide them with additional information, essentially.  And
2   we did so.  And there was minimal communication between our
3   offices for the next several months until about a week or
4   two before this dismissal was filed when they did contact us
5   and said that they had conducted their own independent
6   review of the evidence, this new case team.  They believed
7   that on four of the five counts, the evidence was
8   insufficient as to mens rea.
9           As to the fifth count, which I believe was the
10  transfer of identification information count, they believed
11  that the defendant's guidelines were commensurate with the
12  length of time he had already served incarcerated pretrial,
13  and they believed that in the interest of prosecutorial
14  discretion, it was appropriate to dismiss all of the
15  charges.
16          THE COURT:  Now, the evidence -- so what you're
17  telling me is that in January of '22, this year --
18          MS. ATIYEH:  Yes, Your Honor.
19          THE COURT:  -- that your office provided more
20  fulsome discovery to the California prosecutors?
21          MS. ATIYEH:  Yes, Your Honor.
22          THE COURT:  And I'm assuming -- because, as I
23  recall, Mr. Ferizi was extensively debriefed, and I think
24  that's actually in the defendant's papers when they were
25  making -- because I've read the pleadings that were filed in
```
                                                              5

1   California.  So I saw the motion talking about vindictive

2   prosecution, and it went extensively in the debriefings that

3   Ferizi provided back in 2016, 2017, 2018.

4          So, I mean, the Government -- and, you know, I'm

5   not, for the record, holding anybody in EDVA responsible for

6   what happened.  Raj Parekh came to me as soon as you all

7   found out about it and was very, very upset about it.

8          But, you're still part of the Department of

9   Justice.  The FBI is part of the Department of Justice.  And

10  it certainly is pretty clear to me that there were other

11  members of the Department of Justice who were dissatisfied

12  with the decision that not only I made, but the Fourth

13  Circuit by not granting a stay had also given a preliminary

14  look at the situation and had also ruled that way.

15         So this, in my view, was an attempt to do an

16  end-run around two courts' decisions that there was no

17  appropriate basis to stay the deportation of this -- release

18  and deportation of this defendant.  So it is very troubling

19  what happened here.

20         But, in any case, the defense team in California

21  pointed out that almost all of the information that appeared

22  to be involved in the allegations against the plaintiff --

23  the defendant, were essentially known to the Government.

24         I mean, the way in which this man had gone about

25  hacking the data that he had, and, you know, if it were

6

considered -- and the Government -- the defense points this
out in their opposition to some of your pleadings in this
case right now.  If that information were considered so
significant, that is the data that still is in his computer,
it's inconceivable to me that measures would not have been
taken back in 2018 to get rid of it.

You know, on the record, and I said this in my
original order, the Kosovo authorities were fully
cooperative with the United States Government.  There's no
reason to believe that they would not have worked with the
FBI in interviewing the brother, in getting those -- the
computers, and getting rid of the data.  That's not been
done in this case, as far as I know.

I mean, Kosovo helped get the defendant back from
Malaysia, the extradition didn't take very long.  I mean,
some extraditions with some of our good allies like the UK
can take years.  It took a couple of months to have him
extradited.

The record also shows that while he was held in
Kosovo, he was subjected to pretty significant misconduct.
Several months.  I'm not blaming the U.S. Government for
that, but I'm just saying that Kosovo knows how to handle
defendants if they're concerned about them.  So it's a very,
very troubling case.

So you really don't know exactly why this case was

7

```
 1    dropped other than a re-evaluation of the evidence and a
 2    decision by other prosecutors that there was not sufficient
 3    evidence to go forward?
 4              MS. ATIYEH:  That's -- I mean, that is accurate,
 5    Your Honor.
 6              And I just want to address one thing that you
 7    raised, which is what was or was not known about the
 8    allegations that underlie those charges prior to the charges
 9    being brought.
10              My understanding -- and I was not involved in this
11    case in 2018 when these proffers were going on.  My
12    understanding is that the information about what
13    Mr. Ferizi -- whatever activity he undertook while he was
14    incarcerated in Indiana, that that information came from a
15    jailhouse informant of some sort.  And I was aware -- even
16    at the time of the filing of the original compassionate
17    release response, I was aware that those allegations existed
18    from that jailhouse informant.  But that -- that was the
19    limit of what our office knew at the time.
20              THE COURT:  And you didn't -- but that was not
21    brought to my attention.
22              MS. ATIYEH:  It was not, Your Honor.  And it was
23    not because this jailhouse informant was, as I believe --
24              THE COURT:  Unreliable.
25              MS. ATIYEH:  -- the defense has alluded to, was
```
                                                                    8

```
 1   known to be unreliable.

 2            THE COURT:  Yeah.

 3            MS. ATIYEH:  And I would not put that before Your

 4   Honor because there was no additional information to

 5   validate or verify it.

 6            And so, at that point after Your Honor granted

 7   compassionate release, it's my understanding that the FBI

 8   decided that that would be a valid line of inquiry to

 9   attempt to discover whether -- whether Mr. Ferizi had,

10   indeed, engaged in some sort of illegal activity while he

11   was incarcerated.

12            And, at that point, they did follow-up interviews.

13   They interviewed a number of other people.  They, I suppose,

14   went into the email accounts.  It seems that that's the

15   point at which they did that.  And Your Honor may be right

16   to say that that should have been done in 2018, but it

17   wasn't.

18            THE COURT:  All right.

19            MS. ATIYEH:  Is there anything else I can answer

20   for Your Honor?  I know Your Honor wants to create a record

21   on this, and I'm happy to answer any questions you have as

22   far as what our office is aware of or what we know.

23            THE COURT:  Well, Ms. Mullin, I'm going to ask

24   you.

25            Are there any other issues or questions you would
```

9

1    like the Court to put to the Government on this one?

2                MS. MULLIN:  Court's indulgence.

3                        (Pause.)

4                MS. MULLIN:  Your Honor, just a brief, I guess,

5    response.

6                This Court granted compassionate release on

7    December 3rd, 2020.  And we have a 302 provided by the

8    Government in discovery in Mr. Ferizi's California case that

9    indicates that on January -- I'm sorry.  On December 29th,

10   2020, so after the compassionate release grant and after, I

11   believe, this Court denied the Government's request for a

12   stay, the FBI reached out to Ms. Atiyeh and asked for

13   permission to access email accounts that were referenced in

14   Mr. Ferizi's proffer session.

15               So the Government in this -- this office knew that

16   the FBI was initiating an investigation after this Court had

17   granted compassionate release.  And I think that's one of

18   the arguments -- or I know that's one of the arguments that

19   Mr. Ferizi's defense counsel made in his vindictive

20   prosecution motion.  That after this Court granted

21   compassionate release and after Mr. Ferizi was set to be

22   deported back to Kosovo, this office knew that the FBI was

23   initiating another investigation into Mr. Ferizi based on

24   information that the Government has had since 2018.  Or

25   prior to 2018, because Mr. Ferizi disclosed all of that

                                                              10

```
1    during his proffer sessions.
2              So we agree with the Court's, I guess inclination
3    to think that this was an attempt to end-run the Court's --
4    the authority of the Court and of the Fourth Circuit.
5              THE COURT:  All right.  Ms. Atiyeh, there is
6    something else I want you to address, and I don't believe
7    that you actually were on the brief before the Fourth
8    Circuit; is that correct?
9              MS. ATIYEH:  I was not, Your Honor.  Mr. Attias is
10   here if you need to address any specific questions about
11   that.
12             THE COURT:  Well, the -- in your papers recently
13   filed, you know, there was -- you sort of tried to downplay
14   the emphasis on this new investigation and these new charges
15   as being a -- something that, you know, you really pushed on
16   the Fourth Circuit.
17             But Ms. Mullin has come back and said that, you
18   know, that's a disingenuous position because the information
19   was clearly presented to the Fourth Circuit, and it's
20   clearly the basis for the Fourth Circuit remand to this
21   court, and that is troubling.
22             But, in fact, why did you not, when you were
23   contacted by the FBI, ask the Court at that point to
24   reconsider its decision rather than wasting the Fourth
25   Circuit's time?
```

11

1           MS. ATIYEH:  Your Honor, I think -- I think the

2    answer to that is, is just the timeline.

3           I -- we were in a position where -- Ms. Mullin is

4    correct to say that I was aware that the FBI had begun an

5    investigation into these email addresses.  But there was

6    just a gap in time there, Your Honor, where I was aware that

7    they were conducting an investigation, and then all of a

8    sudden there were new charges in California.

9           There was never a point at which FBI came to our

10   office -- and I will tell Your Honor, to the extent that I

11   talked about this at all with FBI, I had told them it was

12   very unlikely that EDVA would have jurisdiction over any

13   charges resulting from that conduct.  So perhaps that's why

14   they didn't come to our office.

15          But there was no point at which they came back to

16   our office and said that that investigation into the emails

17   had borne fruit.  If they had, I think we would have gone

18   back to Your Honor with that information.  It's just not how

19   it played out.

20          THE COURT:  Well, what communications did you have

21   with the FBI after the Court granted the motion for

22   compassionate release?  Because that was done -- you know,

23   there was one oral argument, and then I think it was just

24   done on the papers after that.  Or did we have a second

25   argument?  I can't recall whether you all --

12

1          MS. MULLIN:  Your Honor, there was one oral

2  argument.

3          THE COURT:  I'm sorry?

4          MS. MULLIN:  There was one oral argument, and the

5  Court granted compassionate release on the papers on

6  December 3rd, 2020.

7          THE COURT:  Right.  All right.  And the oral

8  argument that we did have, because that was in the height of

9  the COVID era, was, as I recall, remote.  It was a telephone

10 conference that we had.

11         MS. ATIYEH:  Yes, Your Honor.

12         THE COURT:  All right.  So there were no FBI

13 agents listening in on that conversation, on that hearing;

14 correct?

15         MS. ATIYEH:  Correct, Your Honor.

16         THE COURT:  All right.  So how did the -- what,

17 it's an agent down in Florida become aware of what was going

18 on?

19         MS. ATIYEH:  Well, Your Honor, the agent down in

20 Florida was the original case agent on the case here.  He

21 was a WFO agent at the time, and he was following the case

22 very closely.  And he was the agent certainly who had

23 provided me the limited information that we had about the

24 accusations from the jailhouse informant that I determined

25 at the time were not sufficiently substantiated to put into

                                                         13

```
1    our response.  So there had been some conversation.

2              After Your Honor granted the compassionate

3    release, I mean, there was -- as I'm sure you can

4    understand, there was substantial communication between our

5    office generally and FBI.  They were upset, Your Honor.

6    They wanted to know if there was anything that could be

7    done.

8              And our office was focused on our appeal, Your

9    Honor.  We -- we believed then, and our appeal was filed

10   prior to the new California charges.  That was always the

11   focus of our office, regardless of whether it meant that

12   Mr. Ferizi was going to get sent back to Kosovo in the

13   interim.  Our focus was on pursuing the appeal.

14             THE COURT:  And excuse me.  When did the Fourth

15   Circuit deny your request for a stay?

16             MS. ATIYEH:  I know that it was prior to the

17   California charges.

18             Do you know the date?

19             MR. ATTIAS:  I don't know the date, but it was

20   prior to the charges.

21             THE COURT:  Uh-huh.

22             MS. ATIYEH:  There was -- you asked what other

23   communication there was between our office and the FBI.

24   There was a lot of discussion -- Your Honor, I can't say

25   strongly enough that we were trying to uphold Your Honor's
```

                                                            14

1    order.  We were communicating with FBI to try to coordinate

2    with ICE because FBI had Mr. Ferizi's travel documents.

3    There was a substantial amount of communication about

4    finding his passport, his travel documents in the FBI

5    evidence rooms and getting them to ICE so we could effect

6    Your Honor's order.

7         There was discussion of FBI conducting some sort

8    of interview with him before he was deported.  There was

9    discussion with FBI about whether it was possible to get him

10   a vaccine to further effectuate Your Honor's order.  Because

11   at the time you'll recall, this was -- this was in January

12   of 2021.  Vaccines had become available but not widely so.

13        And ICE was very concerned about their ability to

14   get Mr. Ferizi back to Kosovo, because he would have had to

15   pass through a third-party country.  Apparently there were

16   no direct flights, and they were concerned that a

17   third-party country would be unwilling to take him without

18   either a vaccine or a lengthy quarantine period.

19        There was a fairly substantial amount of

20   discussion about all of this against the background of my

21   understanding is FBI continuing to pursue this investigation

22   that our office was largely remote from.  And I don't know

23   the reason for that, other than, as I said earlier, Your

24   Honor, that we told them if this was conduct that occurred

25   while he was incarcerated in Indiana, our district is

                                                              15

1   unlikely to have jurisdiction.  And so presumably they were

2   working with AUSAs in other districts.  I had assumed they

3   would have been working in Indiana, so I was particularly

4   surprised by California charges, Your Honor.

5              THE COURT:  Yeah.  Maybe Indiana didn't want to

6   touch it.

7              MS. ATIYEH:  That's entirely possible, Your Honor.

8   I don't know.

9              THE COURT:  All right.  Well, I will tell you,

10  I -- I mulled around in chambers whether I was going to file

11  a referral to the Inspector General for DOJ, because I

12  thought what happened here was really very troubling in that

13  it evidenced to me a mindset that two different courts

14  having granted -- or decided that there was no basis to stay

15  this man's deportation, it didn't sit well with the powers

16  that be, and so they were going to do an end-run around it.

17  Very troubling.  This is not a good record.

18             At the same time, I decided that rather than

19  making such a firestorm, I would simply handle the case the

20  way I'm going to handle it today.

21             I know that the remand -- and I know that you've

22  argued that in the remand the Fourth Circuit indicated the

23  Court should consider other factors than these charges,

24  which I think are an absolute nullity at this point.  I

25  don't believe there's any sufficient evidence of any

                                                            16

 1    misconduct while this man was in custody.

 2           Again, I cited in the original opinion that the

 3    BOP still -- and I guess they were somewhat aware of the

 4    FBI's interest in Mr. Ferizi, still ranked him as low in

 5    terms of the danger that he poses.  They took him from Terre

 6    Haute and put him to the lower level -- not a low level, but

 7    to the medium facility.  They ratcheted down the level of

 8    his incarceration.  And I think the way he's been treated

 9    and the fact that he's spent more than a year of additional

10    time in custody because of what happened here is appalling.

11           You know, the biggest danger this country has to

12    its stability and not necessarily from ISIS and outside

13    sources; it's more internal.  And especially if our own law

14    enforcement people are not willing to respect and comply

15    with the law and decisions of the Court and do it in the

16    proper fashion, I think that's more insidious and more

17    dangerous ultimately than these attacks from outsiders.  So

18    this is a bad case, and I'm considering that in the reasons

19    for my decision.

20           But I am going to reaffirm my decision that

21    Mr. Ferizi is entitled to compassionate release.  The

22    argument that there's been a change -- a material change in

23    condition in terms of COVID I think is not a good one.

24           Number 1, this man does have, and the Government's

25    admitted it, that he has medical conditions that make him

                                                              17

```
 1   particularly susceptible to and vulnerable to the virus,
 2   should he contract it.  And we know that B.2 is beginning a
 3   resurgence of potential problems.  Just today, I believe,
 4   the CDC has now announced that they're recommending a second
 5   booster for vulnerable populations.  The president got a
 6   shot I believe this morning or yesterday.  I heard on the
 7   news this morning that Shanghai is now being shut down by
 8   the Chinese government because they are having a resurgence
 9   of COVID infections in that part of the world.  Europe is
10   undergoing significant resurgence.  And we all know that
11   prison populations are not safe.
12           So I think nothing in my view has changed.  If
13   anything, the record has gotten nastier in this case.  And
14   as I said before, I think Kosovo is able to adequately work
15   with the FBI if they believe that any misconduct is going on
16   with this man.  He'll clearly be on their radar screen.
17           And he is -- as I said in my previous order, he
18   still is under ten years of supervised release.  If he gets
19   involved in rehacking or doing something that violates U.S.
20   law, the United States Government has a long reach, and
21   you've got obviously good relationships with Kosovo.  So
22   there's no reason to believe that he can't be brought back
23   here if he starts to hack into American databases or
24   starting to use American identities in some sort of
25   nefarious conduct.
```

18

1           So I don't think that, in this case, there is the
2  kind of risk to the public that would otherwise be the case.
3  I don't find that any of the information that's been brought
4  to my attention makes a material difference to my decision
5  that this man is an appropriate candidate for compassionate
6  release.  So I am, today, reinstating that order, which
7  means the Government can go forward if it still wishes to
8  appeal that, that's fine.
9           My understanding is that Judge Alsup had ordered
10 the defendant to be placed into ICE custody.  He, I believe,
11 stayed execution of that order for one week, which I think
12 probably has now elapsed.  But I am going to direct that he
13 be turned over to ICE custody.  I am assuming that the FBI
14 did find his passport and that there are no other actions by
15 the FBI that would be holding up his deportation.
16           MS. ATIYEH:  Yes, Your Honor.  That's correct.
17           THE COURT:  All right.  And so I will add to my
18 order that he is to be expeditiously removed from the United
19 States.  All right.
20           Obviously I'm not going to grant a stay, in case
21 you were planning to request that.  So your next step is, as
22 Judge Lewis used to say, invoke the rule of 95 and go down
23 to Richmond if you want to continue pursuing this issue.
24 All right?
25           MS. ATIYEH:  Yes, Your Honor.

                                                        19

```
 1              THE COURT:  Is there anything further?  Defense
 2    counsel didn't get much of a chance to say much.
 3              Ms. Mullin, did you want to put anything on the
 4    record?
 5              MS. MULLIN:  No, Your Honor.  Thank you.
 6              THE COURT:  Have you been in contact -- just for
 7    my information -- come up to the lecturn.
 8              Have you been in contact with Mr. Ferizi at all?
 9              MS. MULLIN:  Not directly.  Through his California
10    attorney.
11              THE COURT:  And how is he doing?
12              MS. MULLIN:  He's -- he's doing okay.  We've been
13    in contact with his family, actually, his mother.  And she's
14    eagerly awaiting his return.  But he's doing okay.  Thank
15    you, Your Honor.
16              THE COURT:  All right.  All right.  That's fine.
17              All right.  Is there anything further on this
18    case?
19              MS. MULLIN:  No, Your Honor.
20              MS. ATIYEH:  Nothing from the Government, Your
21    Honor.
22              THE COURT:  All right.  The last thing I'll say to
23    the Government is, you know, you're still responsible for
24    watching your agents.  One of the toughest jobs a good AUSA
25    has is sometimes riding herd on the agents that work for
```
                                                              20

1    all.  And, you know, that same problem comes to haunt

2    prosecutors with discovery.

3            You're the officer in court, and you represent the

4    United States Government.  And if you've got an FBI agent

5    working behind the scenes who's not playing by the rules,

6    ultimately it comes back to bite the AUSA or the AUSA's

7    office; all right?

8            So, going forward -- I recognize there's a great

9    deal of intense feelings, especially about these types of

10   cases, but that doesn't trump the requirement that the rules

11   be followed; all right?

12           MS. ATIYEH:  Your Honor, I wholeheartedly agree,

13   and I think there may be some conversations going on behind

14   the scenes as to that issue.

15           THE COURT:  I would hope so.  Thank you.

16           MS. ATIYEH:  Yes.

17           THE COURT:  We'll recess court for the day.

18           MS. ATIYEH:  Thank you, Your Honor.

19              (Proceedings adjourned at 10:30 a.m.)

20           ----------------------------------

21   I certify that the foregoing is a true and accurate

22   transcription of my stenographic notes.

23

24                                *Stephanie Austin*

25                           Stephanie M. Austin, RPR, CRR

                                                              21